RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

JOSEPH EBU,

            *Plaintiff-Appellant*,

    *v.*

U.S. CITIZENSHIP AND IMMIGRATION SERVICES;
MICHAEL ZERVAS, USCIS Louisville Field Office
Director,

            *Defendants-Appellees*.

No. 24-5431

─────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:23-cv-00003—Gregory F. Van Tatenhove, District Judge.

Argued:  January 29, 2025

Decided and Filed:  April 16, 2025

Before:  CLAY, GIBBONS, and GRIFFIN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Brian T. Goldman, HOLWELL, SHUSTER & GOLDBERG, LLP, New York, New York, for Appellant.  Carolyn D. Dillard, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  **ON BRIEF:**  Brian T. Goldman, Vincent Levy, Michael Freedman, Colin Mark, HOLWELL, SHUSTER & GOLDBERG, LLP, New York, New York, Charles Roth, NATIONAL IMMIGRANT JUSTICE CENTER, Chicago, Illinois, for Appellant. Carolyn D. Dillard, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

    GRIFFIN, J., delivered the opinion of the court in which CLAY, J., concurred. GIBBONS, J. (pp. 12–27), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.

Plaintiff Joseph Ebu, a lawful permanent resident, was subject to concurrent naturalization and removal proceedings.  Believing that the pending removal proceedings took priority over his naturalization application, defendant United States Citizenship and Immigration Services (USCIS) delayed considering Ebu's naturalization application until his removal proceedings concluded.  But when that delay exceeded 120 days following his naturalization examination, Ebu asked the district court to "determine" his naturalization application and declare him prima facie eligible for naturalization pursuant to 8 U.S.C. § 1447(b).  Relying on our unpublished opinion in *Rahman v. Napolitano*, 385 F. App'x 540, 544 (6th Cir. 2010), the district court dismissed Ebu's complaint under a separate provision that prohibits the determination of a naturalization application while removal proceedings are pending, *see* 8 U.S.C. § 1429.  Because *Rahman* is sound, we affirm the district court's dismissal and hold that § 1429 precludes district courts from considering naturalization applications under § 1447(b) while removal proceedings are simultaneously pending against the applicant.

I.

In 2017, Ebu pleaded guilty in Kentucky state court to facilitating theft by deception and fraudulent use of a credit card.  The government asserts that these crimes involve "moral turpitude" under 8 U.S.C. § 1227(a)(2)(A)(i) and thus commenced removal proceedings against Ebu.  Those proceedings remain ongoing.

Ebu then applied to become a naturalized citizen of the United States and appeared for a naturalization examination.  *See id.* § 1446(b).  Although he passed the required tests, USCIS took no action on his application for months afterward.  This lack of action was apparently due to the Immigration and Nationality Act's so-called "priority provision," which provides that "no

application for naturalization shall be considered by the Attorney General if there is pending against the applicant a removal proceeding." *Id.* § 1429.

When Ebu's naturalization application remained pending for over 120 days after his naturalization examination, Ebu filed this lawsuit. *See id.* § 1447(b). He asked the district court to "determine" his naturalization application and enter a declaratory judgment confirming his prima facie eligibility for naturalization. USCIS moved to dismiss the complaint for failure to state a claim, arguing that, while Ebu's removal proceedings are pending, the district court cannot consider his naturalization application because removal always takes priority over naturalization. Ebu disagreed, arguing that § 1429 limits only the Attorney General (and, in turn, USCIS), not the court. The district court followed our unpublished decision in *Rahman*, granted USCIS's motion, and dismissed Ebu's case. Ebu timely appealed.

II.

We review de novo a district court's dismissal of a case under Federal Rule of Civil Procedure 12(b)(6). *Guzman v. U.S. Dep't of Homeland Sec.*, 679 F.3d 425, 429 (6th Cir. 2012). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to state a "claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). During this review, we accept the complaint's factual allegations as true and will affirm the district court's dismissal if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Guzman*, 679 F.3d at 429 (citation omitted).

A.

The main issue on appeal is whether the district court properly declined to determine Ebu's naturalization application. The answer turns on an issue of statutory interpretation: Does § 1429's prohibition of the "Attorney General" from considering a naturalization application during the applicant's pending removal proceedings also apply to district courts? To make this determination, we "afford the law's terms their ordinary meaning at the time Congress adopted them." *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021). But we also keep in mind that

"statutory language has meaning only in context." *Kentucky v. Biden*, 23 F.4th 585, 603 (6th Cir. 2022) (brackets and citation omitted); *see also Keen v. Helson*, 930 F.3d 799, 803 (6th Cir. 2019) (explaining that statutory interpretation is a "holistic endeavor," in which context, structure, and wording can all "help clarify the meaning of an isolated term" (citation omitted)).  So "we must take care not to interpret the language of a statute in a vacuum; instead, we must look to the structure, history, and purpose of the statutory scheme." *Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 433–34 (6th Cir. 2019) (brackets and internal quotation marks omitted).  And we must interpret different sections of the immigration code as a harmonious whole, "making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Keeley v. Whitaker*, 910 F.3d 878, 884 (6th Cir. 2018) (citation omitted).

1.

We begin with the text of § 1429 and its surrounding provisions.  "By its terms, § 1429 limits only the authority of 'the Attorney General' to act on applications for naturalization when removal proceedings are pending against [the applicant]." *Ajlani v. Chertoff*, 545 F.3d 229, 239 (2d Cir. 2008).  But a neighboring provision, § 1447(b), speaks to the district court's role in deciding naturalization applications:  it affords district courts the power to determine these applications when USCIS fails to do so within 120 days following an applicant's naturalization examination.  In other words, when USCIS (or "the Attorney General") delays too long in determining a naturalization application, § 1447(b) vests the district court with the power to make that determination instead.  Under a "harmonious reading" of those two provisions, where either USCIS or the district court determines a naturalization application, § 1429's prioritization of removal proceedings over naturalization proceedings applies to either decisionmaker.  *Cf. Barnes v. Holder*, 625 F.3d 801, 806 (4th Cir. 2010) ("A harmonious reading of § 1421(c) and § 1429 leads to the conclusion that [a noncitizen] has a statutory right to review of his naturalization application, unless he is in removal proceedings."); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (citation omitted)).

The text and context of §§ 1429 and 1447(b) thus suggest that Congress intended for removal to take priority over naturalization, regardless of forum.

2.

The immigration code's history and purpose confirm this reading. Before the passage of the Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163 (1952) (codified as amended at 8 U.S.C. § 1101 *et seq.*) (INA), "the usual practice had been 'for both the removal and naturalization processes to proceed along together until either the petitioner's removal or naturalization *ipso facto* terminated the possibility of the other occurring.'" *Zayed v. United States*, 368 F.3d 902, 905 (6th Cir. 2004) (brackets omitted) (quoting *Shomberg v. United States*, 348 U.S. 540, 543 (1955)). Under this regime, district courts adjudicated naturalizations, while the Attorney General adjudicated removals. *See id.* So to "end this 'race between the [noncitizen] to gain citizenship [from the court] and the Attorney General to deport him,'" *id.* (quoting *Shomberg*, 348 U.S. at 544), Congress added § 1429—the "priority provision"—to the immigration code when it passed the INA in 1952, *e.g.*, *Shomberg*, 348 U.S. at 541; *Ajlani*, 545 F.3d at 236; *Rahman*, 385 F. App'x at 542. At the time, that provision read,

> [N]o person shall be naturalized against whom there is outstanding a final finding of deportability . . . and no petition for naturalization shall be finally heard by a *naturalization court* if there is pending against the petitioner a deportation proceeding pursuant to a warrant of arrest issued under the provisions of this or any other Act . . . .

INA § 318, 66 Stat. at 244 (codified as amended at 8 U.S.C. § 1429) (emphasis added).

Congress then amended the INA's naturalization procedure in 1990. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 407, 104 Stat. 4978, 5041 (1990) (codified at 8 U.S.C. § 1101 *et seq.*). To streamline the process and alleviate the backlog on district courts' dockets, *see Etape v. Chertoff*, 497 F.3d 379, 386 (4th Cir. 2007), Congress afforded the Attorney General the "sole authority to naturalize persons as citizens of the United States," 8 U.S.C. § 1421(a); *see also Zayed*, 368 F.3d at 905. In turn, that Act included a corresponding change to § 1429: "'the Attorney General' replaced the 'naturalization court' as the entity precluded from acting on naturalization applications during the pendency of removal proceedings." *Zayed*, 368 F.3d at 905.

Then in the Homeland Security Act of 2002, Congress transferred naturalization authority to the Secretary of the Department of Homeland Security and correspondingly moved the function of adjudicating naturalization petitions to USCIS, a "component" of the Department of Homeland Security. *Yith v. Nielsen*, 881 F.3d 1155, 1158 (9th Cir. 2018); *see also* 6 U.S.C. §§ 202(3), 271(b)(2); 8 U.S.C. §§ 1103(a)(1), (g)(1). Consequently, "courts interpret the reference to the Attorney General in 8 U.S.C. §§ 1421 and 1429 'as referring to the authority of the USCIS.'" *Akpovi v. Douglas*, 43 F.4th 832, 835 n.2 (8th Cir. 2022) (quoting *Yith*, 881 F.3d at 1158). Noncitizens thus now seek naturalization through USCIS. *See* 8 C.F.R. § 316.4(a).

Still, the INA provides for judicial review in the naturalization process in two narrow circumstances. First, district courts may review de novo administrative denials of naturalization applications. 8 U.S.C. § 1421(c); *see also Zayed*, 368 F.3d at 905. Second—the circumstance here—a naturalization applicant may apply to the district court for a hearing on his application if USCIS "fail[s] to make a determination" on the application within 120 days of the applicant's naturalization examination. 8 U.S.C. § 1447(b); *see also Rahman*, 385 F. App'x at 543. In such a case, the district court "may either determine the matter or remand the matter" to USCIS. 8 U.S.C. § 1447(b).

The history and purpose of §§ 1429 and 1447(b) therefore reveal that Congress intended for removal proceedings to take priority over naturalization applications—or in other words, that removal must be determined before naturalization eligibility. *See Zayed*, 368 F.3d at 905; *see also Ajlani*, 545 F.3d at 238; *Saba-Bakare v. Chertoff*, 507 F.3d 337, 340 (5th Cir. 2007). Congress enacted § 1429 to "end th[e] race" between removal and naturalization, and it explicitly prioritized removal over naturalization. *See Zayed*, 368 F.3d at 905 (internal quotation marks omitted). Indeed, Congress titled § 1429 "[p]rerequisite to naturalization," confirming its purpose of ensuring completion of pending removal proceedings first. *See Dubin v. United States*, 599 U.S. 110, 120–21 (2023) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (internal quotation marks omitted)). Thus, what was once a race is now a defined sequence. While Ebu's removal proceedings are pending, no adjudicator (judicial or administrative) may determine his naturalization eligibility. *See Zayed*, 368 F.3d at 906 ("The exclusive power to naturalize

[noncitizens] rests with the Attorney General, as we have seen, and § 1429 bars the use of that power while removal proceedings are pending."); *Rahman*, 385 F. App'x at 544.

That § 1429 does not explicitly refer to district courts does not change this conclusion. As explained, when Congress amended the INA in 1990, it simply replaced "a naturalization court" (i.e., a district court) with "the Attorney General" (now USCIS) to streamline the naturalization process. *See Etape*, 497 F.3d at 386. That change thus brought the "old soil" of Congress's INA revisions, *see Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (citation omitted), and conformed with the Immigration Act of 1990's transfer of naturalization power from the judiciary to the executive. Put differently, these amendments *limited* the courts' naturalization power; they did not *expand* it beyond USCIS's. *See Ajlani*, 545 F.3d at 239 (opining that district courts' naturalization power "cannot be any greater than the authority of the Attorney General to consider the petition in the first place" (citation omitted)). Indeed, as we highlighted, Congress established two very limited circumstances in which district courts may become involved in naturalization proceedings. *See* 8 U.S.C. §§ 1421(c), 1447(b).

With this context and history in mind, § 1429's lack of explicit reference to district courts does not create some previously unknown expansion of the district courts' power. In fact, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Congress did not intend to expand courts' limited role in naturalization proceedings and sidestep USCIS's "sole" naturalization authority. *See* 8 U.S.C. § 1421(a).

This conclusion is the only logical one. While noncitizens' removal proceedings are pending, district courts cannot afford them the relief that § 1447(b) contemplates—determination of the naturalization application or remand to USCIS. For the reasons explained, a district court cannot "determine" a noncitizen's naturalization application because his removal proceedings must conclude first. Nor can the court "remand" the matter to USCIS with appropriate instructions because § 1429 prohibits USCIS from considering a noncitizen's naturalization application when he is subject to removal proceedings. Ebu concedes that remand is not a viable option, so his argument rests on the district court's purported power to "determine" his

naturalization application.    But if half the district court's supposed options when reviewing naturalization applications do not apply here, the option to remand would be rendered mere surplusage. *See Nielsen v. Preap*, 586 U.S. 392, 414 (2019).  Congress intends for its words to have meaning, *see Stone v. I.N.S.*, 514 U.S. 386, 397 (1995), and because Ebu's interpretation would render words meaningless, we cannot adopt it.

3.

Most circuits to consider this issue (including ours in an unpublished opinion) have concluded that § 1447(b) cannot provide relief when § 1429 applies.  *See Rahman*, 385 F. App'x at 544; *Ajlani*, 545 F.3d at 241; *Saba-Bakare*, 507 F.3d at 340.  These cases relied on the historical context of the naturalization statutory scheme outlined above to conclude that "Congress did not contemplate judicial orders of naturalization under circumstances where Congress has called an explicit statutory halt to the executive's ability to give any further consideration to [a noncitizen's] naturalization application until removal proceedings end." *Ajlani*, 545 F.3d at 240; *accord Rahman*, 385 F. App'x at 543 ("[Section] 1429 similarly limits the scope of the district court's review and circumscribes the available remedies in an action brought under § 1447(b) when removal proceedings are pending against the applicant.").  We see no reason to depart from our correct holding in *Rahman*—and the same holdings from the Second and Fifth Circuits—that district courts are precluded from granting relief under § 1447(b) while the plaintiff has removal proceedings pending.  385 F. App'x at 544.

Taking the opposite view, Ebu asks us to follow the one outlier opinion that created the circuit split on this issue.  *See Yith*, 881 F.3d at 1165.  In *Yith*, the Ninth Circuit determined that, "on its face, § 1429 restricts only the Attorney General and does not limit the district court's power to naturalize an applicant while removal proceedings are pending." *Id.* at 1161.  And it interpreted the Immigration Act of 1990's replacement of "naturalization court" with "Attorney General" in the INA not as a limitation on the district courts, but as an express decision to end the district courts' inability to naturalize citizens while they have pending removal proceedings. *See id.* at 1162.  So *Yith* held that "§ 1429 applies only to the Attorney General, not the district court, [and] the district court erred in concluding that the reference to the Attorney General in § 1429 prevented it from granting relief under § 1447(b)." *Id.* at 1165.

But *Yith*'s cursory analysis did not meaningfully consider the historical context of the immigration code—specifically, why Congress would have ended the "race" between naturalization and removal in 1952 just to restart it again in 1990. *See Zayed*, 368 F.3d at 905. Not to mention, *Yith* incorrectly viewed the 1990 amendments to the INA as an expansion of the district court's naturalization power rather than a transfer of such power to USCIS. *See* 881 F.3d at 1162. Therefore, we remain on the majority side of the circuit split rather than deepen the split caused by the Ninth Circuit's erroneous conclusion in *Yith*.

4.

In sum, when a noncitizen is concurrently subject to removal and naturalization proceedings, removal takes priority. *See* 8 U.S.C. § 1429. In such circumstances, a district court can provide no effective relief to a noncitizen under § 1447(b), meaning the district court here correctly declined to address the merits of Ebu's naturalization application due to his ongoing removal proceedings. Accordingly, we follow our correct holding in *Rahman* and affirm the district court's dismissal of Ebu's complaint.

B.

That takes us to Ebu's fallback position. Despite the statutory prohibition on determining Ebu's naturalization application, Ebu insists that the district court erred in dismissing his request for a declaration that he is prima facie eligible for naturalization. The district court dismissed Ebu's declaratory-judgment count for two reasons: (1) it could not usurp USCIS's sole naturalization power while removal proceedings were pending, and (2) because Ebu still faced deportation, the requested declaratory judgment would constitute an impermissible advisory opinion. These findings were correct, not reversible errors.

The Declaratory Judgment Act provides federal courts the authority to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). "But § 2201 does not create an independent cause of action." *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007). In other words, absent the claim for declaratory relief, the action must be "real and substantial" and permit "specific relief through a decree of a conclusive character, as

distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted).

Section § 1429 bars the district court from issuing Ebu relief on his substantive claim raised under § 1447(b). Without any claims left providing him possible relief, his declaratory-judgment claim must also be dismissed. *See Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth.*, 108 F.3d 658, 668 (6th Cir. 1997) ("A request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred."); *see also Davis*, 499 F.3d at 594. Because Ebu is not entitled to relief under § 1447(b) while his removal proceedings are pending, he also is not entitled to a declaratory judgment that would effectively sidestep the statute prohibiting the district court from considering his naturalization application.

Likewise, a declaratory judgment would be an unenforceable advisory opinion. *See MedImmune, Inc.*, 549 U.S. at 127. Even if we remanded this case to the district court to issue Ebu's requested declaratory judgment—that he meets the prima facie requirements for naturalization—he would still be subject to removal proceedings, which, as explained above, must be adjudicated prior to his naturalization eligibility. And if he is ordered to be removed, the district court's declaratory judgment would have no effect, amounting to an advisory opinion. *See Ala. State Fed'n of Lab., Loc. Union No. 103 v. McAdory*, 325 U.S. 450, 461 (1945) (noting that courts are without power to issue advisory opinions, which may be opinions deciding "abstract, hypothetical or contingent questions"). Therefore, the district court did not err in dismissing Ebu's declaratory-judgment claim.

Disagreeing, Ebu asks us to follow two out-of-circuit opinions holding that district courts can issue naturalization-related declaratory judgments in limited circumstances. *See Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 259–61 (3d Cir. 2012); *Klene v. Napolitano*, 697 F.3d 666, 669 (7th Cir. 2012). But these cases involved the propriety of a declaratory judgment where the district courts exercised jurisdiction under an entirely different provision, § 1421(c). And in any event, *Gonzalez* and *Klene* conflict with *Zayed*. There, we held that when a noncitizen's naturalization application is denied under § 1429 because of pending removal proceedings, a district court's review under § 1421(c) is limited solely to "review of that

threshold determination" of whether USCIS properly denied the application under § 1429. *Zayed*, 368 F.3d at 906.  We cannot reject our own binding precedent for conflicting, out-of-circuit caselaw.

Because § 1429 does not permit the district court to award Ebu relief under § 1447(b), he is not entitled to relief on his substantive claim, and consequently, he is not entitled to an accompanying declaratory judgment.

## III.

Finally, we note that nine days after Ebu filed his notice of appeal, USCIS denied his naturalization application "based solely on the pending removal proceedings."  That denial raises jurisdictional questions we need not answer today:  whether USCIS had the authority to resolve Ebu's application after he filed this § 1447(b) case, *see Rahman*, 385 F. App'x at 545, and whether that denial moots this case.  Because "we have leeway to choose among threshold grounds for denying audience to a case on the merits," *Nessel ex rel. People of Mich. v. Enbridge Energy, LP*, 104 F.4th 958, 964 (6th Cir. 2024) (internal quotation marks omitted); *see also In re: 2016 Primary Election*, 836 F.3d 584, 587 (6th Cir. 2016) (deciding the "easier" standing issue instead of the more-complicated mootness issue), we save those jurisdictional questions for a case in which the parties properly brief them.  And in any event, as explained, the district court appropriately dismissed this case based on § 1429 without considering the merits of Ebu's naturalization application.  *See Rahman*, 385 F. App'x at 544–45 (deciding a § 1447(b) case even though USCIS denied the plaintiff's naturalization application after she filed her federal case).

## IV.

For these reasons, we affirm the district court's judgment.

————————————

**DISSENT**

————————————

JULIA SMITH GIBBONS, Circuit Judge, dissenting.   Joseph Ebu wants to become a United States citizen.   He filed a naturalization application, participated in an interview, and passed an examination.  *See* 8 U.S.C. § 1446.   Ebu then waited for the United States Citizenship and Immigration Services ("USCIS") to make a final determination on his application.   But after several months passed, Ebu sought relief in federal court.   The Immigration Act of 1990 explicitly grants district courts authority to adjudicate naturalization applications when, as in Ebu's case, USCIS fails to determine the application within 120 days of the applicant's examination.  *See* 8 U.S.C. § 1447(b).

The district court, however, determined that it lacked authority to adjudicate Ebu's naturalization application under a different provision of the Act, 8 U.S.C. § 1429, which bars "the Attorney General" from considering a naturalization application while removal proceedings are pending.   The majority now affirms that erroneous decision, concluding that § 1429's prohibition on the Attorney General applies to a district court.

Because I cannot construe a statute in a manner that conflicts with its plain meaning, and § 1429 plainly applies to "the Attorney General" and not the federal courts, I respectfully dissent.

I.

The crux of this appeal is whether the district court had authority to decide Ebu's naturalization application.   Resolving that question turns on the meaning of two statutory provisions.  The first is § 1447(b), which empowers a district court to determine a naturalization matter when USCIS delays too long.  *See* 8 U.S.C. § 1447(b).  The second is § 1429, which bars

the Attorney General (now, USCIS)**[1]** from considering a naturalization application when the applicant is subject to removal proceedings.  *See* 8 U.S.C. § 1429.

In statutory interpretation cases, this court's analysis "begins—and sometimes ends—with 'the plain language of the statute.'"  *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 253 (6th Cir. 2020) (citation omitted).  Our starting point is the statutory text because we "assum[e] that the ordinary meaning of that language accurately expresses the legislative purpose."  *Michigan Flyer LLC v. Wayne Cnty. Airport Auth.*, 860 F.3d 425, 428 (6th Cir. 2017) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009)).  "The people who come before us are entitled, as well, to have independent judges exhaust 'all the textual and structural clues' bearing on that meaning."  *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021) (citation omitted).  When the language of the statute is clear and unambiguous, our inquiry is complete:  we apply the statute as written.  *Donovan*, 983 F.3d at 253.

A.

While the majority begins its analysis with § 1429, Maj. Op. at 4 ("We begin with the text of § 1429 and its surrounding provisions."), I would begin with § 1447(b), the provision that Ebu claims entitles him to relief.

Section 1447(b) allows a naturalization applicant to seek recourse in federal court when USCIS fails to determine the application within a specific timeframe.  Under the provision, "[i]f there is a failure to make a determination" on a naturalization application "before the end of the 120-day period after the date on which the examination is conducted," then "the applicant may apply to the United States district court . . . for a hearing on the matter."  8 U.S.C. § 1447(b).  In such a case, the "[district] court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to [USCIS] to determine the matter."  *Id.*  So when a naturalization applicant properly invokes § 1447(b) and applies for a hearing in the district court, "that court has exclusive jurisdiction over the naturalization application unless

---

**[1]**The role of the "Attorney General" has since been delegated to the U.S. Department of Homeland Security ("DHS"), which houses USCIS.  *See Shewchun v. Holder*, 658 F.3d 557, 562 (6th Cir. 2011); *see also* 6 U.S.C. §§ 552(d), 557 (providing that statutory references to the Attorney General are deemed to refer to DHS).

and until the matter is remanded to the agency." *Aljabri v. Holder*, 745 F.3d 816, 821 (7th Cir. 2014).

Ebu passed his naturalization examination in July 2022, but as of January 2023, USCIS had not acted on his application. USCIS therefore "fail[ed] to make a determination" on his application within 120 days of his examination, and Ebu was entitled to "apply to the United States district court . . . for a hearing on the matter." 8 U.S.C. § 1447(b). Thus, the plain language of § 1447(b) expressly authorizes the district court to adjudicate Ebu's application.

Nothing in § 1429 deprives the district court of authority to adjudicate Ebu's application. Section 1429 states that "no application for naturalization shall be considered by the *Attorney General*" when removal proceedings are pending. 8 U.S.C. § 1429 (emphasis added). By its plain terms, then, § 1429 limits only the authority of the Attorney General. *Ajlani v. Chertoff*, 545 F.3d 229, 239 (2d Cir. 2008); *see Oubre v. Energy Operations, Inc.*, 522 U.S. 422, 427 (1998) ("[W]e are bound to take Congress at its word."). It does *not* limit the authority of the district court. Because § 1429 precludes only the Attorney General from acting on a naturalization application while the applicant is facing removal and says nothing about the courts, I believe that the district court had the authority to "determine" Ebu's naturalization application under § 1447(b).

B.

The majority, for its part, does not dispute that § 1429 plainly applies to the Attorney General, not the district court. Nonetheless, the majority emphasizes that the provision must be read in context. That is, of course, true. We interpret the words of a statute "in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). When the key terms of a statute are ambiguous and potentially broad, we may "look to their surrounding words." *Dubin v. United States*, 599 U.S. 110, 120 (2023). But here, the key statutory terms—"the Attorney General"—are clear and specific. 8 U.S.C. § 1429. It is therefore unnecessary to look at their surrounding language. *Cf. Marinello v. United States*, 584 U.S. 1, 7 (2018) (determining that the statutory terms "obstruct or impede" were neutral and broad and then turning to the surrounding language). By doing so here,

however, the majority manufactures ambiguity out of thin air. *See Sackett v. Env't Prot. Agency*, 598 U.S. 651, 725 (2023) (Kavanaugh, J., concurring) ("We should not create ambiguity where none exists.").

But even if the statutory terms were unclear, § 1429's text and its context lead to the same result. In other words, stepping back from the words "Attorney General" provides only further evidence that Congress said what it meant and meant what it said. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

When a naturalization applicant faces removal proceedings, § 1429 provides that "no application for naturalization shall be considered by the Attorney General." 8 U.S.C. § 1429. But when "there is outstanding a final finding of deportability," § 1429 provides that "no person shall be naturalized." *Id.* If "no application for naturalization shall be considered by the Attorney General" precludes both executive and judicial review, then it would have the same meaning as "no person shall be naturalized." *Id.* This court must, however, "give effect, if possible, to every clause and word of a statute." *United States v. Dean*, 969 F.2d 187, 190 (6th Cir. 1992) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). Applying that principle here, "no application for naturalization shall be considered by the Attorney General" limits only the executive's authority, while "no person shall be naturalized" limits both the executive and judicial branch's authority. *See Yith v. Nielsen*, 881 F.3d 1155, 1161–62 (9th Cir. 2018). Thus, when the executive initiates removal proceedings against a naturalization applicant, it cannot simultaneously determine the applicant's naturalization application, but no such limitation applies to the courts. Once the applicant is determined to be deportable, however, neither the executive nor the courts can naturalize the applicant. Despite what one may think of such a framework, it is the framework demanded by the statutory text.

The majority does not contend with the surrounding text in § 1429. It argues instead that § 1429 must be read along with § 1447(b) and, under a "harmonious reading" of the two provisions, removal proceedings take priority in administrative and judicial proceedings. Maj. Op. at 4 (citing *Barnes v. Holder*, 625 F.3d 801, 806 (4th Cir. 2010)). The majority does not explain why this interpretation results from a harmonious reading. It merely concludes that Congress intended for removal proceedings to take priority regardless of the forum. This court

cannot, however, "replace the actual text of the statute with speculation as to Congress' intent." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (quotation omitted).

Nor does the majority explain why §§ 1429 and 1447(b) must be harmonized in the first place: applying the plain language of § 1429 would not render § 1447(b)'s terms "inconsistent, meaningless or superfluous." *Keeley v. Whitaker*, 910 F.3d 878, 884 (6th Cir. 2018) (citation omitted). Section 1429 outlines various prerequisites to naturalization, one of which is that the applicant is not subject to removal proceedings. *See* 8 U.S.C. § 1429. If the applicant faces pending removal proceedings, the Attorney General cannot consider the naturalization application. *Id.* ("[N]o application for naturalization shall be considered by the Attorney General if there is pending against the applicant a removal proceeding."). Section 1447(b), on the other hand, grants district courts authority to adjudicate naturalization applications in a limited set of cases: when USCIS "fail[s] to make a determination" on the application within 120 days of the applicant's examination. 8 U.S.C. § 1447(b). Read together, the two provisions contemplate a scheme where the executive is tasked with reviewing naturalization applications but, in limited cases, as when the executive delays too long, the courts can step in. Thus, reading § 1429's limit on the Attorney General's authority for what it is—a limit on the Attorney General's authority—does not conflict with § 1447(b)'s grant of authority to the courts.

It is true that, in amending the immigration code, Congress afforded the Attorney General the "sole authority to naturalize persons as citizens of the United States." 8 U.S.C. § 1421(a); *see Zayed v. United States*, 368 F.3d 902, 905 (6th Cir. 2004). So, the majority reasons, if the Attorney General cannot consider a naturalization application under § 1429, then neither can the courts under § 1447(b).

But in granting the Attorney General "sole" naturalization authority, Congress did not eliminate the courts' role entirely. Rather, in recognition of "the long-standing power the district courts had possessed over naturalization applications," *Etape v. Chertoff*, 497 F.3d 379, 386 (4th Cir. 2007), Congress "reserved a measure of naturalization jurisdiction for the courts." *Ajlani*, 545 F.3d at 236; *see* 8 U.S.C. § 1447(a)–(b). As relevant here, the district courts may intervene if USCIS "fail[s] to make a determination" on the application within 120 days after the applicant's examination. 8 U.S.C. § 1447(b). In such a case, the district court may "determine

the matter or remand the matter, with appropriate instructions, to [USCIS] to determine the matter." *Id.*

Yet even when the district court intervenes under § 1447(b), its decision to grant a naturalization application is not the final step in the naturalization process. *See generally* U.S. Citizenship and Immigration Services, A Guide to Naturalization 31–38 (2016). An applicant is finally naturalized when she takes an oath of allegiance and receives a certificate of naturalization. 8 U.S.C. §§ 1448, 1449. USCIS performs both of these functions. *See id.* So if a district court grants a naturalization application under § 1447(b), USCIS still must administer these final steps in the process, consistent with its "sole authority" to naturalize applicants. *Id.* § 1421(a). Section 1429 imposes no barrier on USCIS's final authority, as that provision merely bars USCIS from "consider[ing]" an "application for naturalization." *Id.* § 1429; *see Kabura v. McNeer*, 448 F. Supp. 3d 1274, 1283 (D. Utah 2020) ("The final process by which an alien is actually naturalized remains the sole province of USCIS."). Thus, when read in harmony, §§ 1447(b) and 1421(a) show that a district court can decide an application for naturalization without infringing on USCIS's sole authority to naturalize persons.

Even if §§ 1447(b) and 1421(a) conflict, the former provision would control. When a statute's general prohibition is contradicted by a specific permission, we construe the specific provision as an exception to the general one. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *see, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974). Section 1447(b) is a specific provision, applying to the specific situation of when a district court may adjudicate a delayed naturalization application. *Morton*, 417 U.S. at 550. Section 1421(a), on the other hand, is a general provision, granting the executive, but not the courts, naturalization authority. Because § 1447(b) is the more specific provision, we must construe it as an exception to § 1421(a)'s grant of exclusive naturalization authority to the executive. We are simply "not at liberty to pick and choose among congressional enactments." *Id.* at 551. When two provisions can be interpreted to coexist, it is our "duty" to give meaning to both. *Id.*; *see United States v. Hunter*, 12 F.4th 555, 567 (6th Cir. 2021).

Because the plain language of § 1429 is unambiguous, I would end the analysis there and apply the text as written. The text of § 1429 prohibits "the Attorney General" from considering a

naturalization application when the applicant is subject to removal proceedings.  The text does not limit the authority of the courts to determine a naturalization application—indeed, it does not even mention the courts.  The district court therefore erred in concluding that it lacked authority to grant Ebu relief under § 1447(b).

## II.

The majority tries to avoid the unambiguous text of § 1429 by invoking several statutory canons of construction.  Because the statutory text is unambiguous, this court should not introduce unnecessary ambiguity into the text.  As this court has explained, "resort to judicially created rules of statutory construction is appropriate only in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters or when the statutory language is ambiguous." *Nixon v. Kent Cnty.*, 76 F.3d 1381, 1386 (6th Cir. 1996) (cleaned up).  In all other circumstances, the plain meaning of the statute controls. *Id.*

As discussed, § 1429's terms are not ambiguous.  Nor would a literal application of its terms produce an absurd result. *See Donovan*, 983 F.3d at 253.  We should not, therefore, introduce unnecessary ambiguity into the text. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) (rejecting invocation of canons as an "attempt to create ambiguity where the statute's text and structure suggest none").  But even considering the various canons, they do not support the majority's interpretation.

The majority first invokes the "no elephants in mouseholes" canon.  This canon recognizes that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions"—in other words, it does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Section 1429 is not some obscure or ancillary provision in the immigration code.  To the contrary, it sets out the requirements for naturalization and prohibits the Attorney General from considering a naturalization application when there are ongoing removal proceedings against the applicant. *See* 8 U.S.C. § 1429.  Indeed, according to the majority, it contains the critical "priority provision" that constrains both USCIS and the courts from naturalizing applicants

during removal proceedings. Nor are the relevant terms of § 1429 vague. In fact, the terms could not be clearer. The provision states that "*no* application for naturalization shall be considered by the *Attorney General* if there is pending against the applicant a removal proceeding." *Id.* (emphases added). It should not come as a surprise, then, that § 1429 does not divest the district courts of naturalization authority when it does not mention them and specifically divests another entity of authority. The majority opinion's reliance on the "no elephants in mouseholes" canon is therefore misguided.

The majority also relies on the canon against surplusage. According to that canon, "every word and every provision is to be given effect" and "[n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." *Nielsen v. Preap*, 586 U.S. 392, 414 (2019) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012)).

Under § 1447(b), a district court has two options: it may "determine the matter or remand the matter, with appropriate instructions, to the [USCIS] to determine the matter." 8 U.S.C. § 1447(b). All parties agree that when an applicant is subject to removal proceedings, USCIS cannot consider the application. *See id.* § 1429. In such cases, then, it would be futile for the district court to remand the matter to USCIS. The majority reasons that if the district court cannot remand, then half of its options under § 1447(b) would be rendered mere surplusage.

The majority's argument is unpersuasive for several reasons. First, just because a *remedy* that a statute authorizes is barred in a specific instance does not mean that the *words* of the statute are meaningless. The words are clear and retain full effect whether the applicant is subject to removal proceedings or not. But even if the words of § 1447(b) could be said to lose their meaning, it is only when the applicant is subject to concurrent removal proceedings. In all other cases, the district court remains free to remand the matter to USCIS.

In any event, the majority's interpretation of § 1429 would result in a far greater violation of the canon against surplusage. If, according to the majority's interpretation, § 1429 bars the executive and judicial branches from reviewing naturalization applications, then *all* of the district court's options under § 1447(b) would be futile and rendered surplusage. It is puzzling, then,

that the majority declines to adopt Ebu's interpretation because it "would render words meaningless" when its proposed interpretation would render twice as many words meaningless. Maj. Op. at 8.

In sum, this court need not rely on the statutory canons of construction because § 1429's text is clear and unambiguous and would not produce an absurd result. But even if this court considers the canons, they do not undermine the statute's plain meaning—if anything, they reinforce the plain language and confirm that the district court had authority under § 1447(b) to determine Ebu's naturalization application.

## III.

Lacking textual support for its interpretation, the majority turns to the statute's history and purpose. It is "[p]erhaps the primary rule of statutory interpretation [] that a court will not look beyond the statutory text if the text is unambiguous." *Olden v. LaFarge Corp.*, 383 F.3d 495, 505–06 (6th Cir. 2004) (citing *BedRoc Ltd., LLC v. United States*, 541 U.S. 176 (2004)). But even if the text were ambiguous, the statutory history and purpose do not establish that § 1429 precludes judicial relief under § 1447(b).

## A.

The statute's historical context suggests that § 1429 constrains the executive, but not the courts, from considering naturalization applications. Before 1990, district courts had authority to naturalize, while the Attorney General had authority to deport noncitizens. *Zayed*, 368 F.3d at 905. Under this regime, the standard practice "was for both the deportation and naturalization processes to proceed along together until either petitioner's deportation or naturalization ipso facto terminated the possibility of the other occurring." *Shomberg v. United States*, 348 U.S. 540, 543 (1955). These dueling processes ultimately created a rush for the noncitizen to gain citizenship before the Attorney General could deport him. *Zayed*, 368 F.3d at 905. So, in 1952, Congress enacted § 1429 to end this race. At the time, the provision provided that "no petition for naturalization shall be finally heard by a naturalization court if there is pending against the petitioner a deportation proceeding." Immigration and Nationality Act, Pub. L. No. 414, § 318, 66 Stat. 163, 244 (1952) (codified at 8 U.S.C. § 1429 (1952)).

This system ultimately proved unworkable because of the enormous stress it placed on the district courts' dockets, resulting in a long backlog of naturalization applications. *See Etape* 497 F.3d at 386. Thus, in 1990, Congress "attempted to streamline the process by giving the Attorney General authority to naturalize a citizen without permission from the district court." *Id.* (citing 135 Cong. Rec. H4539-02 (July 31, 1989) (statement of Rep. Morrison)); *see* Immigration Act of 1990, Pub. L. No. 101-649, § 401(a), 104 Stat. 4978, 5038 (1990) (codified at 8 U.S.C. § 1421(a) (1994) ("The sole authority to naturalize persons as citizens of the United States is conferred upon the Attorney General.")). Consistent with this change, Congress amended § 1429, replacing a "naturalization court" with "the Attorney General" as the entity precluded from acting on naturalization applications during the pendency of removal proceedings. Immigration Act of 1990 § 407(d)(3) (codified at 8 U.S.C. § 1429).

The Attorney General's naturalization authority, however, was not exclusive. Rather, in recognizing "the long-standing power the district courts had possessed over naturalization applications," *Etape*, 497 F.3d at 386, Congress provided a role for the courts in two situations. First, a district court may review de novo an administrative denial of a naturalization application. 8 U.S.C. § 1421(c); Immigration Act of 1990 § 401(c). Second, an applicant may apply to the district court for a hearing on the application if USCIS "fail[s] to make a determination" on the application within 120 days of the applicant's naturalization examination. 8 U.S.C. § 1447(b); Immigration Act of 1990 § 407(d)(14). In such a case, the district court "may either determine the matter or remand the matter" to USCIS. 8 U.S.C. § 1447(b).

The statutory history therefore shows that while Congress initially barred courts from determining naturalization applications during removal proceedings in § 1429, it later removed any reference to the courts. *Yith*, 881 F.3d at 1162. And when Congress shifted primary naturalization authority from the courts to the Attorney General, it "specifically *retained* district courts' power to adjudicate naturalization applications, at a time when Congress could easily have eliminated that power" altogether. *Etape*, 497 F.3d at 387.

B.

The majority opinion reads the history differently. According to the majority, when Congress amended the immigration code in 1990, it intended to preserve the 1952 Act's bar on judicial naturalizations while removal proceedings are pending. But that assumption is defied by what Congress actually did: *remove* the language barring the courts from naturalizing applicants subject to removal proceedings. *See* 8 U.S.C. § 1429. So, if anything, the historical context suggests that Congress intended to end the bar on judicial naturalizations that formerly existed in § 1429. *See Yith*, 881 F.3d at 1162 ("Nothing in the 1990 amendments suggests that Congress intended to preserve the 1952 act's bar on a district court naturalizing applicants while removal proceedings are pending, and Congress's decision to remove the provision suggests it wanted to end such a bar."); *Dilone v. Nielsen*, 358 F. Supp. 3d 490, 501 (D. Md. 2019) ("The fact is, § 1429 used to bar courts from hearing naturalization petitions while removal proceedings were under way; that statutory bar was on the books for decades, but Congress effectively deleted it." (citation omitted)).

IV.

The caselaw does not compel a different result. Several courts have concluded that § 1429 does not preclude district courts from affording relief under § 1447(b), *see, e.g.*, *Yith*, 881 F.3d at 1164; *Dilone*, 358 F. Supp. 3d at 501; *Kabura*, 448 F. Supp. 3d at 1283, or another provision of the naturalization statute, *see, e.g.*, *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 260–61 (3d Cir. 2012); *Klene v. Napolitano*, 697 F.3d 666, 669 (7th Cir. 2012). These courts adhere to § 1429's text and conclude that the provision's bar on "the Attorney General" limits only the executive from considering or determining a naturalization application.

The majority relies on two cases from our sister circuits—*Saba-Bakare*, 507 F.3d 337 (5th Cir. 2007) and *Ajlani v. Chertoff*, 545 F.3d 229 (2d Cir. 2008)—and this court's unpublished decision in *Rahman v. Napolitano*, 385 F. App'x 540 (6th Cir. 2010).

In *Rahman*, a panel of this court held that § 1429 precludes judicial review under § 1447(b) while removal proceedings are pending. *See* 385 F. App'x at 543. *Rahman* is an unpublished decision and, as a result, is considered only for its persuasive value. *See United*

*States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007). But we should not be persuaded by *Rahman*. First, the plaintiff in *Rahman* was pro se and therefore lacked the benefit of counseled briefing.**2** *See Rahman*, 385 F. App'x at 541. *Rahman* is also not persuasive on the substance. The *Rahman* court concluded that it was bound by this court's decision in *Zayed*, addressing the effect of § 1429 in an action under § 1421(c). *Id.* at 542–43. In *Zayed*, this court held that § 1429 precluded the district court from reviewing a final administrative denial of naturalization under § 1421(c) once removal proceedings had begun. *Zayed*, 368 F.3d at 903. Believing it was bound by *Zayed*, the *Rahman* court concluded that "§ 1429 similarly limits the scope of the district court's review and circumscribes the available remedies in an action brought under § 1447(b) when removal proceedings are pending against the applicant." *Rahman*, 385 F. App'x at 543.

This court is not bound by *Zayed* because §§ 1421(c) and 1447(b) address entirely different situations. The former provision allows a district court to "review" USCIS's denial of a naturalization application, 8 U.S.C. § 1421(c), while the latter provision allows a district court to "determine" or "remand" a delayed naturalization "matter." *Id.* § 1447(b). A district court's authority under § 1421(c) is much narrower than its authority under § 1447(b). Section 1421(c) entitles an applicant to judicial review of a denial of a naturalization application but limits the scope of the district court's review to the "ground for the denial." *De Lara Bellajaro v. Schiltgen*, 378 F.3d 1042, 1043 (9th Cir. 2004), *as amended* (Sept. 1, 2004); *see also Zayed*, 368 F.3d at 906 ("Where [USCIS] has denied an application for naturalization on the ground that removal proceedings are pending . . . the district court's de novo review is limited to review of that threshold determination."). Section 1447(b), by contrast, allows a district court to determine an entire naturalization matter when USCIS has failed to render a decision in a timely fashion. *Rahman* did not address these significant textual differences, and so its reasoning should not be followed.**3** *See Yith*, 881 F.3d at 1163 ("[R]eliance on *Bellajaro* and other decisions

---

**2**The *Rahman* plaintiff did, however, have backing from amicus counsel from the Ohio Affiliate of the Council on American-Islamic Relations. That is, of course, no substitute for actual counsel. *See* 4 Am. Jur. 2d *Amicus Curiae*, § 6 (2025) ("An amicus curiae is not a party and generally cannot assume the functions of a party, or an attorney for a party.").

**3**Nor does *Zayed* stand for the general proposition that "[t]he scope of the district court's authority 'cannot be any greater than the authority of the [executive] to consider the petition in the first place.'" CA6 R. 20, Appellee

analyzing § 1421(c) is misplaced."); *Dilone*, 358 F. Supp. 3d at 500 ("Judging by the text of the two statutes, a court's authority under § 1421(c) is considerably narrower than its authority under § 1447(b).").

*Rahman* is also unpersuasive because it fails to actually interpret the relevant naturalization statutes. The *Rahman* court instead reasoned that judicial relief under § 1447(b) was precluded because, in its view, "district court authority to grant naturalization relief while removal proceedings are pending cannot be greater than that of the Attorney General." *Rahman*, 385 F. App'x at 544 (quoting *Ajlani*, 545 F.3d at 544). The same is true for the Second and Fifth Circuits' decisions: both cases infer a statutory prohibition on judicial relief without locating it in the text of §§ 1429 or 1447(b). *See Saba-Bakare*, 507 F.3d at 340 ("Under § 1447(b), then, the district court could have either determined the matter or remanded the matter for the USCIS to determine the matter. But in either instance the appropriate determination is controlled by § 1429."); *Ajlani*, 545 F.3d at 240 ("[I]t would seem to work against the framework set forth in §§ 1447 and 1429 for the district court to undertake such an evaluation where Congress has expressly prohibited the Attorney General from doing so."). Such reasoning, however, substitutes the court's own view of Congress' intent for the text of the statute. *See Yith*, 881 F.3d at 1164 ("*Ajlani* substituted its own views of Congressional purpose for the actual language of the statute."). But "it is never our job to rewrite a constitutionally valid statutory text." *Henson*, 582 U.S. at 89. The majority's reliance on these unpersuasive cases cannot overcome the clear and unambiguous text.

V.

Lastly, the majority argues that it would be illogical to afford judicial relief to Ebu because Congress did not intend to give district courts greater naturalization authority than USCIS. But Congress might have intended to do just that. For example, Congress might have

---

Br., at 24 (citing *Zayed*, 368 F.3d at 906). That statement was a parenthetical quote from a district court decision addressing the scope of review under § 1421(c). *See Zayed*, 368 F.3d at 906 (citing *Apokarina v. Ashcroft*, 232 F. Supp. 2d 414, 416 (E.D. Pa. 2002)). Thus, even if the statement is attributable to the *Zayed* court, it is mere dicta. *See Awe v. Napolitano*, 494 F. App'x 860, 865 n. 7 (10th Cir. 2012) ("Because only a § 1421 petition is at issue here, any statements we might make about § 1447(b) petitions would be dicta."). More importantly, that statement cannot be squared with the unambiguous text, which grants district courts authority to review delayed naturalization applications without exception. *See* 8 U.S.C. § 1447(b).

sought to afford the courts more authority "to ensure that applicants had judicial recourse when the [USCIS] failed to act." *Etape*, 497 F.3d at 386. And Congress could have reasonably concluded that the judicial rather than the executive branch was best equipped to protect naturalization applicants stuck in limbo because of executive delay. *See* H.R. Rep. No. 101-187, at 14. Congress might also have sought to give the courts greater authority to prevent the executive from initiating removal proceedings to obstruct judicial consideration of naturalization applications. *See Kestelboym v. Chertoff*, 538 F. Supp. 2d 813, 818 (D.N.J. 2008) ("If this Court were to read the statute as Defendants suggest, Congress's grant of jurisdiction to the district courts to review the denial of naturalization applications would be effectively rendered void. The Attorney General could then trump all applications for naturalization by simply instituting removal proceedings.").

Yet whatever Congress had in mind, the text of § 1429 is clear—it applies to the "Attorney General," not the district court. 8 U.S.C. § 1429. It therefore places no bar on the judicial relief that Ebu seeks. And it is beyond the province of this court to impose such a bar because we believe that Congress would have thought it appropriate to do so. *See Henson*, 582 U.S. at 89.

## VI.

After erroneously concluding that Ebu is not entitled to relief on his substantive claim, the majority concludes that Ebu is also not entitled to a declaratory judgment. The majority reasons that because § 1429 bars the district court from granting Ebu relief under § 1447(b), he cannot "sidestep the statute" by obtaining a declaratory judgment finding him prima facie eligible for naturalization. Maj. Op. at 11. For the reasons discussed, I believe that the district court had authority to decide Ebu's application. Thus, because § 1429 does not bar the district court's authority to decide Ebu's application, it also does not bar the district court from issuing a declaratory judgment.

The majority next argues that even if the district court issued the requested declaratory judgment, Ebu could still be ordered removed. If he is ordered removed, the majority reasons,

the district court's declaratory judgment finding him prima facie eligible for naturalization would have no effect, making it a mere advisory opinion.

That reasoning has been rightfully rejected by several of our sister circuits. *See Gonzalez*, 678 F.3d at 260–61; *Klene*, 697 F.3d at 669. As these courts observe, a declaratory judgment finding the noncitizen eligible for naturalization "affects the record for . . . removal proceedings." *Gonzalez*, 678 F.3d at 261. Indeed, a declaratory judgment could help "bring the removal proceeding to a prompt close" because the noncitizen "could plead the declaratory judgment in the removal proceedings." *Klene*, 697 F.3d at 669. Because the district court's declaratory judgment would "affect[] the behavior" of the government towards Ebu, it would not be an advisory opinion. *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 971 (6th Cir. 2009) (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987)) (emphasis omitted).

The majority argues that these cases are not persuasive because they addressed the district court's authority under § 1421(c), not § 1447(b). But the majority then concludes that even if these cases are relevant, they should not be followed because they conflict with *Zayed*, our decision addressing a district court's authority under § 1421(c). The majority, however, cannot have it both ways—either the cases interpreting § 1421(c) are relevant or they are not.

In any event, *Zayed* does not bar the district court from issuing a declaratory judgment. In considering the possibility of declaratory relief in that case, the panel expressly declined to pursue the issue because the plaintiff did not seek a declaratory judgment. *See Zayed*, 368 F.3d at 906 ("In the case at bar, however, Ms. Zayed did not request declaratory relief—and a declaration that she would be eligible for naturalization but for the pendency of removal proceedings might well have been a vain act in any event."); *see also Klene*, 697 F.3d at 669 (discussing *Zayed*'s declaratory judgment discussion). *Zayed* therefore does govern when, as here, the plaintiff expressly seeks a declaratory judgment.

Because the district court had authority under § 1447(b) to determine Ebu's naturalization application, and a live case or controversy exists with respect to Ebu's request for a declaratory judgment, the district court erred in concluding that it lacked authority to issue a declaratory

judgment.  I would therefore remand so the district court may award appropriate declaratory relief to Ebu.  *See Am. C.L. Union of Ohio, Inc. v. Taft*, 385 F.3d 641, 650–51 (6th Cir. 2004).

\* \* \*

The importance of this case cannot be overstated.  Federal district courts "are creatures of Congress, and Congress can expand federal jurisdiction."  *K.B. ex rel. Qassis v. Methodist Healthcare - Memphis Hosps.*, 929 F.3d 795, 799 (6th Cir. 2019); *see Bowles v. Russell*, 551 U.S. 205, 212–13 (2007).  So when this court is called on to construe a jurisdictional statute, we must interpret it "with precision and with fidelity to the terms by which Congress has expressed its wishes."  *Kucana v. Holder*, 558 U.S. 233, 252 (2010) (citation omitted).  Because the majority's reading of the immigration statute so obviously fails to do so, I respectfully dissent.